# United States District Court

SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

V.

RONALD COXE, and
STEPHEN CLARK

**CRIMINAL COMPLAINT**

CASE NUMBER: 00-5162

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about July 18, 2000, in Palm Beach County, in the Southern District of Florida the defendants did, (Track Statutory Language of Offense)

possess with the intent to distribute marijuana, a Schedule I controlled substance, and conspire to do the same,

in violation of Title 21 United States Code, Section(s) 846 and 841(a)(1)

I further state that I am a(n) DEA Special Agent and that this complaint is based on the following facts:

Please see attached affidavit.

Continued on the attached and made a part hereof: [X] Yes [ ] No

Signature of Complainant
THOMAS D. MASTERS
Drug Enforcement Administration, Task Force Officer

Sworn to before me, and subscribed in my presence,

July 19, 2000 at West Palm Beach, Florida
Date                                                City and State

ANNE E. VITUNAC
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF COMPLAINT

Your affiant, Thomas D. Masters, being duly sworn, deposes and states:

1. I am a Special Agent of the United States Department of Justice, Drug Enforcement Administration (hereinafter referred to as "DEA"), within the meaning of Section 878 (a) of Title 21, United States Code, and thus am an agent empowered by law to conduct investigations, make arrests, and seize property for violations of Title 18, United States Code and Title 21, United States Code. I have been employed by the DEA since 1997 and have worked at the Florence, South Carolina Resident Office and the Fort Lauderdale, Florida District Office of the DEA. Prior to appointment as a Special Agent, I was employed as a Probation and Parole Agent by the South Carolina Probation, Parole, and Pardon Services for approximately four years. I have received specialized training in narcotics investigations, identification of narcotics, and the laws of search and seizure. The information set forth in this affidavit is based upon my own personal knowledge, as well as information provided to me by other persons and law enforcement officers involved in this investigation. This affidavit is intended to serve as a summary of the following investigation and does not include each and every detail.

2. On July 18, 2000, your affiant and other law enforcement officers were conducting surveillance at Southern Self Storage located at 8425 West Okeechobee Boulevard in West Palm Beach, Palm Beach County, Florida. The officers conducting surveillance observed a 1977 Cadillac El Dorado bearing Florida tag 146-251, arrive at said storage facility driven by RONALD COXE (hereinafter referred to as "COXE") with STEPHEN CLARK (hereinafter referred to as "CLARK") seated in the front passenger seat. This vehicle proceeded to storage

unit L-29 and parked. Your affiant was unable because of his surveillance position to observe what occurred inside storage unit L-29 after the 1977 Cadillac El Dorado parked. However, CLARK was not observed by your affiant departing from the storage unit or its immediate vicinity once the 1977 Cadillac El Dorado was parked. Approximately 40 minutes after initially arriving at storage unit L-29, COXE repositioned the 1977 Cadillac El Dorado by backing into said unit causing your affiant's view of the 1977 Cadillac El Dorado's trunk to become obstructed.

3. Approximately 45 minutes after the vehicle was parked inside storage unit L-29, the 1977 Cadillac El Dorado with COXE driving and CLARK seated in the front passenger seat left storage unit L-29, departed the storage facility, and was subsequently stopped by law enforcement. A canine trained in the detection of narcotics was summoned and positively alerted to the presence of drugs within the trunk of the 1977 Cadillac El Dorado and storage unit L-29. After the canine alerted positively to the presence of drugs inside the trunk of the 1977 Cadillac El Dorado, COXE advised a law enforcement officer that marijuana was present in said car's trunk and hidden in a boat stored in unit L-29. COXE subsequently gave permission for law enforcement to search the 1977 Cadillac El Dorado, the boat inside storage unit L-29, and the storage unit itself. COXE relinquished the keys to both the 1977 Cadillac El Dorado and storage unit L-29 to law enforcement so the searches could be conducted.

4. The search of storage unit L-29 led to the confiscation of a boat after seven bales of marijuana each weighing approximately 20 pounds for a total of 140 pounds were found underneath the seats inside a hidden compartment closed shut by rivets and bolts.

5. The search of the trunk of the 1977 Cadillac El Dorado led to the discovery and seizure of the following items:

Three bales of marijuana weighing approximately 20 pounds each for a total of 60 pounds inside said car's trunk.

Underneath the marijuana bales found inside the car's trunk, were two pairs of gloves.

A rivet gun inside said car's trunk.

A tool box containing screwdrivers and other tools.

Two cordless drills with bits attached for rivets and bolts of the same size as the rivets and bolts used to close the hidden compartment found to contain marijuana on the boat.

6. The search of the 1977 Cadillac El Dorado led to the discovery and seizure

of the following items:

A pair of gloves on the floorboard of the front passenger seat where Clark was seated prior to the traffic stop.

7. The packaging of the ten bales of marijuana seized from the boat and the trunk of the

1977 Cadillac El Dorado was similar. I have viewed the contents of the ten seized bales and,

based upon my training and experience, I know the same to be marijuana.

FURTHER AFFIANT SAYETH NAUGHT.

*[signature]*
THOMAS D. MASTERS, SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Subscribed and sworn to before me
this 19th day of July 2000.

*[signature]*
ANN E. VITUNAC
UNITED STATES MAGISTRATE JUDGE

# United States District Court

_____ SOUTHERN _____ DISTRICT OF _____ FLORIDA _____

UNITED STATES OF AMERICA

V.

ROBERT ESKIN

**CRIMINAL COMPLAINT**

CASE NUMBER: $00-4179-SNOW$

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. From on or about <u>April 5, 2000 to approximately July 18, 2000</u>, in <u>Broward and Palm Beach</u> Counties, in the _____ Southern _____ District of Florida the defendant did, (Track Statutory Language of Offense)

possess with the intent to distribute marijuana, a Schedule I controlled substance, and conspire to do the same,

in violation of Title __21__ United States Code, Section(s) __846 and 841(a)(1)__

I further state that I am a(n) __DEA Special Agent__ and that this complaint is based on the following facts:
<br>Official Title

Please see attached affidavit.

Continued on the attached and made a part hereof:  [x] Yes  [ ] No

_____
Signature of Complainant
THOMAS D. MASTERS
Drug Enforcement Administration, Task Force Officer

Sworn to before me, and subscribed in my presence,

July 19, 2000 _____ at  Fort Lauderdale, Florida
Date                                                                                  City and State

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE                _____
Name and Title of Judicial Officer                                Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF COMPLAINT

Your affiant, Thomas D. Masters, being duly sworn, deposes and states:

1. I am a Special Agent of the United States Department of Justice, Drug Enforcement Administration (hereinafter referred to as "DEA"), within the meaning of Section 878 (a) of Title 21, United States Code, and thus am an agent empowered by law to conduct investigations, make arrests, and seize property for violations of Title 18, United States Code and Title 21, United States Code. I have been employed by the DEA since 1997 and have worked at the Florence, South Carolina Resident Office and the Fort Lauderdale, Florida District Office of the DEA. Prior to appointment as a Special Agent, I was employed as a Probation and Parole Agent by the South Carolina Probation, Parole, and Pardon Services for approximately four years. I have received specialized training in narcotics investigations, identification of narcotics, and the laws of search and seizure. The information set forth in this affidavit is based upon my own personal knowledge, as well as information provided to me by other persons and law enforcement officers involved in this investigation. This affidavit is intended to serve as a summary of the following investigation and does not include each and every detail.

2. On April 5, 2000, DEA Task Force Agents, DEA Special Agents, and members of the North Broward Drug Enforcement Unit were conducting surveillance of an unindicted co-conspirator. During surveillance conducted at the unindicted coconspirator's residence, law enforcement officers observed what appeared to be a narcotics transaction between the unindicted co-conspirator and a person later identified as William GREENWALD.

GREENWALD has a prior criminal history for violation of narcotics laws. Shortly after GREENWALD arrived at the unindicted co-conspirator's residence, GREENWALD and the unindicted co-conspirator exited the residence and left the area in separate vehicles. Both subjects were followed away from the residence by two surveillance teams. GREENWALD was later stopped by surveillance units and found to be in possession of approximately 2 pounds of marijuana.

3.  The unindicted co-conspirator was followed by surveillance to a restaurant located at the 2200 block of West Glades Road in Boca Raton, Florida where he met with a person later identified as RONALD COXE (hereinafter referred to as "COXE"). COXE is a prior convicted narcotics trafficker. COXE had arrived at said location driving a 1977 Cadillac El Dorado. Both men were approached by members of the surveillance team who requested consent to search both the unindicted co-conspirator's and COXE'S vehicles. Consent was granted and a certified narcotics detection canine alerted positively to a box located inside the unindicted co-conspirator's vehicle. A search of the box revealed that the box contained $220,000.00 in U. S. currency. The currency was seized by law enforcement on that date. The trunk area of COXE'S Cadillac was also alerted to by the certified narcotics detection canine. A search of the vehicle revealed three empty, large canvas bags that had a strong odor of marijuana emitting from them. The bags were also seized at the scene on that date.

4.  On April 19, 2000, surveillance was once again established on the unindicted co-conspirator. The purpose of the surveillance was to execute an arrest warrant for the unindicted co-conspirator issued in Broward County for felony possession of marijuana. The unindicted co-conspirator was stopped in Boynton Beach, Florida and taken into custody

pursuant to the arrest warrant. A search incident to arrest revealed that the unindicted co-conspirator was in possession of $50,000.00 in U. S. currency. This money was seized by law enforcement at the scene on that date. The unindicted co-conspirator advised law enforcement officers that he (the unindicted co-conspirator) was taking the money to COXE to pay a portion of a debt owed for a previous marijuana shipment.

5. In May of 2000, the unindicted co-conspirator decided to cooperate with law enforcement and provided the following information as it pertains to this investigation: The unindicted co-conspirator stated that ROBERT ESKIN (hereinafter referred to as "ESKIN"), STEPHEN CLARK (hereinafter referred to as "CLARK"), and other persons in the South Florida area were recruited to act as drivers, transporters and "catchers," (persons that accept mailed packages of marijuana and safely store the same until distributed) for the marijuana shipped from Arizona to South Florida. ESKIN and CLARK acquired post office boxes and warehouses that were to be utilized to "catch" and store shipments of marijuana that were mailed to Florida from Arizona. The unindicted co-conspirator advised that approximately five shipments of marijuana totaling between 100 and 200 pounds per mailing were mailed. The unindicted co-conspirator stated that around April of 1998 he and his co-conspirators decided to utilize a 19' boat with a hidden compartment to transport the marijuana shipments by a trailer carrying said boat towed by a vehicle between Arizona and Florida. The unindicted co-conspirator said that the 19' boat was driven from Florida to Arizona, loaded with marijuana, and driven back to Florida. The unindicted co-conspirator said that each load weighed between 150 and 200 pounds. The unindicted co-conspirator stated that they employed several other persons to assist with the storage and distribution of the marijuana. The

unindicted co-conspirator stated that the 19' boat was difficult to transport so COXE came up with a plan to utilize two smaller boats with hidden compartments to transport the marijuana between Arizona and Florida. The unindicted co-conspirator stated that each boat could hold about 200 pounds of marijuana inside the hidden compartments. The unindicted co-conspirator said that the boats began to be used to transport the marijuana between Arizona and Florida in April of 1999.

6. The unindicted co-conspirator stated that CLARK and ESKIN were the main drivers once the marijuana was purchased and the hidden compartments in the boats were loaded and secured. The unindicted co-conspirator said that COXE was one of the individuals responsible for purchasing the marijuana from the Arizona marijuana supplier. The unindicted co-conspirator stated that he, ESKIN, and COXE would secure warehouses in South Florida to store the load of marijuana and the transport vehicles. The unindicted co-conspirator and COXE were responsible for removing the rivets on the plate that covered the hidden compartment in the boats, removing the marijuana, and re-securing the plate to the boats. The unindicted co-conspirator stated that approximately 10 loads of marijuana were transported by using the boats from Arizona to Florida prior to the seizure by law enforcement from the unindicted co-conspirator of the $270,000.00 in U. S. currency on April 5 and 19, 2000.

7. During the week of July 7, 2000, information was received that COXE and ESKIN were planing to travel to Arizona for the purpose of purchasing and transporting marijuana from Arizona to South Florida. The marijuana was to be transported in the same manner as the previous 10 loads. Your affiant learned of this proposed shipment of marijuana through a series of recorded telephone calls and face to face meetings between the unindicted co-

conspirator, COXE, and ESKIN. During a July 6, 2000 recorded meeting between COXE and the unindicted co-conspirator, COXE stated that he planned to fly to Arizona on July 10, 2000. Southwest Airlines confirmed that COXE did travel to Arizona using his middle name "Arthur COXE" on that date.

8.  During a meeting between ESKIN and the unindicted co-conspirator recorded on July 11, 2000, ESKIN stated that he had spoken to COXE in Arizona. ESKIN then placed a call to COXE in Arizona and both the unindicted co-conspirator and ESKIN discussed the proposed marijuana shipment with COXE. Later that day, during a recorded phone call between the unindicted co-conspirator and ESKIN, ESKIN stated that he (ESKIN) was probably leaving for Arizona on either July 12 or 13, 2000, for the purpose of driving the marijuana laden boat to South Florida.

9.  On July 13, 2000, a court order was sought and obtained from Magistrate Judge Barry Seltzer to attach an electronic tracking device to a 1977 Cadillac El Dorado, Florida tag 146-251 registered to and used by COXE.

10. On July 18, 2000, your affiant and other law enforcement officers were conducting surveillance at Southern Self Storage located at 8425 West Okeechobee Boulevard in West Palm Beach, Palm Beach County, Florida. The officers conducting surveillance observed a 1977 Cadillac El Dorado bearing Florida tag 146-251, arrive at said storage facility driven by RONALD COXE (hereinafter referred to as "COXE") with STEPHEN CLARK (hereinafter referred to as "CLARK") seated in the front passenger seat. This vehicle proceeded to storage unit L-29 and parked. Your affiant was unable because of his surveillance position to observe what occurred inside storage unit L-29 after the 1977 Cadillac El Dorado parked. However,

CLARK was not observed by your affiant departing from the storage unit or its immediate vicinity once the 1977 Cadillac El Dorado was parked. Approximately 40 minutes after initially arriving at storage unit L-29, COXE repositioned the 1977 Cadillac El Dorado by backing into said unit causing your affiant's view of the 1977 Cadillac El Dorado's trunk to become obstructed.

11. Approximately 45 minutes after the vehicle was parked inside storage unit L-29, the 1977 Cadillac El Dorado with COXE driving and CLARK seated in the front passenger seat left storage unit L-29, departed the storage facility, and was subsequently stopped by law enforcement. A canine trained in the detection of narcotics was summoned and positively alerted to the presence of drugs within the trunk of the 1977 Cadillac El Dorado and storage unit L-29. After the canine alerted positively to the presence of drugs inside the trunk of the 1977 Cadillac El Dorado, COXE advised a law enforcement officer that marijuana was present in said car's trunk and hidden in a boat stored in unit L-29. COXE subsequently gave permission for law enforcement to search the 1977 Cadillac El Dorado, the boat inside storage unit L-29, and the storage unit itself. COXE relinquished the keys to both the 1977 Cadillac El Dorado and storage unit L-29 to law enforcement so the searches could be conducted.

12. The search of storage unit L-29 led to the confiscation of a boat after seven bales of marijuana each weighing approximately 20 pounds for a total of 140 pounds were found underneath the seats inside a hidden compartment closed shut by rivets and bolts.

13. The search of the trunk of the 1977 Cadillac El Dorado led to the discovery and seizure of the following items:

Three bales of marijuana weighing approximately 20 pounds each for a total of

    60 pounds inside said car's trunk.

    Underneath the marijuana bales found inside the car's trunk, were two pairs of gloves.

    A rivet gun inside said car's trunk.

    A tool box containing screwdrivers and other tools.

    Two cordless drills with bits attached for rivets and bolts of the same size as the rivets and bolts used to close the hidden compartment found to contain marijuana on the boat.

14. The search of the 1977 Cadillac El Dorado led to the discovery and seizure of the following items:

    A pair of gloves on the floorboard of the front passenger seat where Clark was seated prior to the traffic stop.

15. The packaging of the ten bales of marijuana seized from the boat and the trunk of the 1977 Cadillac El Dorado was similar. I have viewed the contents of the ten seized bales and, based upon my training and experience, I know the same to be marijuana.

16. Subsequent to the arrests of COXE and CLARK, ESKIN had a series of conversations with the unindicted co-conspirator. During a meeting recorded on July 18, 2000, ESKIN told the unindicted co-conspirator the following:

    ESKIN had personally observed the arrests of COXE and CLARK.

    ESKIN parked the boat containing the hidden compartment filled with marijuana inside storage unit L-29.

    ESKIN wished he had removed the license tag affixed to the boat trailer because said tag is registered to him and will connect him to the marijuana laden boat.

    ESKIN stated his fingerprints may be found on the hidden compartment where the marijuana was secreted aboard the boat because he did not always wear gloves.

ESKIN has devised an alibi whereby he will claim that he loaned the boat to COXE and was unaware of the marijuana's presence or COXE'S intention to use the boat to facilitate the transportation of the marijuana.

ESKIN said he had invested $10,000.00 to secure the purchase of the marijuana based upon a promise he received from COXE that the money would be re-paid immediately upon the arrival of the marijuana in South Florida. ESKIN was upset because the arrest of COXE would cause ESKIN to not receive the money owed.

ESKIN stated he was not going to return to his residence. Instead, ESKIN said he was going to gather money so he could flee to avoid arrest.

FURTHER AFFIANT SAYETH NAUGHT.

THOMAS D. MASTERS, SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Subscribed and sworn to me
before this 19th day of July 2000.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Page 8 of 8